UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

MICHAEL THOMPSON,

                  Plaintiff,

    -against-

MARK BOSSWICK and SANFORD E. EHRENKRANZ
(in their capacity as Trustees of the
Riverside Trust) and PETER LAMBERT
(individually and in his capacity as
Manager of the Riverside Trust),

                  Defendants.

----------------------------------------X

10 Civ. 6647

OPINION

A P P E A R A N C E S:

Attorneys for Plaintiff

CHARNEY AND ASSOCIATES
9 West Market Street, Suite B
Rhinebeck, NY  12572
By:  Nathaniel K. Charny, Esq.
     Thomas Edward Feeney, Esq.

Attorney for Defendants

ELLENOFF GROSSMAN & SCHOLE LLP
150 East 42nd Street, 11th Floor
New York, NY  10017
By:  Ted Poretz, Esq.
     Christopher Matthew Pisacane, Esq.

**Sweet, D.J.**

The Defendants Mark Bosswick ("Bosswick") and Sanford
E. Ehrenkranz ("Ehrenkranz") (named solely in their capacity as
Trustees of the Riverside Trust, hereinafter the "Trust") and
Peter Lambert (named individually and in his capacity as Manager
of the Trust) ("Lambert" and, along with Bosswick and
Ehrenkranz, the "Defendants") have filed a motion for summary
judgment, pursuant to Fed. R. Civ. P. 56, to dismiss the
complaint filed by the plaintiff Michael Thompson ("Thompson" or
the "Plaintiff").  Upon the facts and conclusions set forth
below, the Defendants' motion for summary judgment is granted in
part and denied in part.

## Prior Proceedings

On September 8, 2010, the Plaintiff filed an initial
complaint against Ehrenkranz, Lambert and Ira Yohalem, seeking
damages and other relief arising out of the defendants' alleged
interference with the Plaintiff's employment opportunities,
defamation, negligent misrepresentation and breach of contract.
On October 26, 2010, the Plaintiff filed his First Amended
Complaint, dropping Ira Yohalem as a defendant and adding

1

Bosswick.  The First Amended Complaint described how Thompson
served for two years as the estate manager of the Trust's
property in New Paltz, New York and alleged that Lambert,
Thompson's supervisor, defamed him by telling four employment
agencies as well as the Trust's principals, Robert and Grace
DeNiro, that Thompson had received a kickback in the form of
free lawn care services for his personal property from the
Trust's landscape contractors.  The First Amended Complaint
alleged that these comments cost him his job with the Trust as
well as the assistance of the four named employment agencies and
sought to recover under eight causes of action: (1) defamation,
(2) tortious interference with prospective business and
contractual relations with respect to Thompson's relationships
with the employment agencies, (3) tortious interference with
prospective business and contractual relations with respect to a
potential business opportunity with the Soros Family, (4) breach
of the covenant of good faith and fair dealing with respect to
Thompson's employment contract with the Trust, (5) breach of
contract with respect to Lambert's confidentiality agreement
with the Trust, (6) breach of contract with respect to
Thompson's severance agreement, (7) negligent misrepresentation,
and (8) tortious interference with employment relations against
Lambert.

2

On September 7, 2011, the Defendants moved for summary
judgment, seeking to dismiss the First Amended Complaint.
Subsequent to the Defendants' motion for summary judgment, the
Plaintiff filed a Second Amended Complaint dated November 23,
which dismissed the third cause of action, eliminated all
references to one of the four employment agencies, dropped an
allegation that Thompson moved his family east in reliance on a
promise from one of the Defendants and identifies the parties to
whom the alleged defamatory statements were made.   The
Defendants' consented to the filing of this Second Amended
Complaint, and filed reply papers in further support of their
motion to dismiss the Second Amended Complaint on December 5,
2011.   The Defendants' motion was marked fully submitted on
December 7, 2011.

**The Facts**

The facts, as set forth in both the Defendants' and
Plaintiff's Local Rule 56.1 Statements of Undisputed Material
Facts as well as the affidavits the parties have submitted, are
not in dispute except as noted below.

3

Thompson, who currently resides in Maine, is a former employee of the Trust.  The Trust is the owner of an estate in Ulster County, New York owned by Robert DeNiro and Grace Hightower DeNiro.  Bosswick and Ehrenkranz are trustees of the Trust, and Lambert, at all times relevant to the Plaintiff's complaint, was Thompson's supervisor during the time he was employed with the Trust.  According to the Plaintiff, Thompson's chosen field of employment is domestic estate management for high wealth individuals and families, and, prior to the conduct alleged in this lawsuit, Thompson had an untarnished work record in this field.

Thompson began working for the Trust in September 2007 and signed a confidentiality agreement regarding his employment. This agreement states that his "employment with the Trust was an at-will employment relationship, terminable by either Employer or Employee, with or without cause, at any time."  According to the Plaintiff, Lambert called Thompson in mid-October 2007 and offered him a position with the Trust, and the Plaintiff officially started on November 1, 2007.  The Plaintiff contends that when he first started, he understood from Lambert that Jelske, who Plaintiff was succeeding, would remain employed in a diminished role under the Plaintiff's supervision.  According to

4

the Plaintiff, some time passed before Jelske tendered his
resignation, and he was paid a severance package equal to 90
days of his regular salary.  The Plaintiff contends that Lambert
requested that Thompson assist him in investigating Jelske, who
Lambert determined may have been involved in criminal acts.  The
Plaintiff states that his investigation confirmed that Jelske
had been demanding kickbacks from vendors, paying ghost
employees including his family members and demanding at least
one vendor to overbill and sharing the difference with the
vendor.

        According to the Defendants, for part of 2008 and all
of 2009, Thompson received free lawn mowing services at his
personal residence from Lynn Warren Landscaping, the Trust's
outside landscape contractor.  The Defendants also contend that,
in 2009, Thompson received free snowplowing services from the
Trust's snowplow vendor, who the Defendants identify as Jim
Watkins but the Plaintiff identifies as Jim Watson.  The
Plaintiff disputes these allegations and states that, with
respect to the snow removal services, he instructed the vendor
to bill him for all services provided, that invoices were
received and that he paid each invoice promptly.  According to
the Defendants, there is no admissible evidence in the record

that Lambert ever told Robert or Grace DeNiro that Thompson
received free lawn mowing services prior to Thompson's
termination from the Trust.  The Defendants also contend that
Thompson never heard Lambert tell the DeNiros or anyone else
that he received free lawn mowing services.  The Plaintiff
disputes these contentions.

        The Defendants state that, on or about September 23,
2009, the Plaintiff was told that his employment with the Trust
was being terminated.  According to the Plaintiff, on September
24, 2009, Lambert advised Thompson that he was being
transitioned out of the position of Estate Manager and that
Thompson's employment with the Trust and the DeNiro family would
be terminated.  According to the Defendants, the Plaintiff's
last day as an employee of the Trust was October 15, 2009.  The
Plaintiff disputes this contention, stating that the record is
unclear as to the Plaintiff's last day because he was employed
in a "transitional phase" as of October 1, 2009.

        According to the Plaintiff, at the time of his
termination, he was expressly asked by Lambert if he would
commit to staying on for a transitional period of 90 days.  The
Plaintiff contends that he was told by Lambert that the DeNiros'

6

attorney was consulted prior to the conversation and that if the
Plaintiff agreed to stay on for the transition period, the
Plaintiff would be paid a severance payment equal to 90 days of
his wages.  According to the Plaintiff, on October 1, 2009,
Lambert met with Thompson in Thompson's office to discuss the
transition arrangements, and Lambert stated that finding the
Plaintiff's replacement would take considerable time and that
Thompson's continued employment would be needed for at least
three to four months.  The Plaintiff contends that Lambert
informed him that after his services were no longer needed,
Thompson would be guaranteed a 90 day severance payment.   The
Plaintiff continued his employment during this transition
period, and, although the Plaintiff contends that he requested a
written separation agreement, no such agreement was executed.
According to the Plaintiff, Lambert was consoling about the
nature of Thompson's termination and promised Thompson that he
would write a reference letter, assist in finding a new job,
forward along job contacts and help the Plaintiff in any way he
could.   The Plaintiff states that, in reliance on Lambert's
statements, he put Lambert's name down as a reference in
submissions to employment agencies.

In early October 2009, Thompson began looking for a new job, several days after being told that his employment with the Trust was terminated. While looking for a new job, Thompson sent resumes to four employment agencies: the Pavillion Agency ("Pavillion"), the Calendar Group ("Calendar"), Mahler Private Staffing ("Mahler") and Vincent Minuto of Hampton Domestics ("Minuto"), as well as several others. According to the Plaintiff, these four agencies are the dominant employment agencies capable of placing individuals in estate management positions.

Pavillion sent Thompson on an interview with the family of Robert and Melissa Soros, who ultimately elected not to hire Thompson. Although the Defendants contend that there is no evidence that Lambert gave a bad reference to either Pavillion or the Soros Family, the Plaintiff states that, prior to a follow-up interview, he was told by a Pavillion agent that Pavillion would be securing a reference from Lambert and was later informed by Pavillion that no progress was being made related to the position. According to the Plaintiff, Thompson has had similar promising leads through Calendar Group and Mahler Private Staffing also fail to materialize after the

8

employment agencies informed Thompson that they would be
conducting a reference check.

The Plaintiff contends that on or about November 30,
2009, Mahler designated the Plaintiff "dnp," meaning "do not
place," because of Lambert's bad reference.  The Plaintiff also
contends that on December 1, 2009, Thompson had a telephone
conversation with Vincent Minuto during which Minuto informed
him that his employment agency would be unable to help the
Plaintiff because he had heard about the Plaintiff taking
kickbacks during his employment with the Trust.

On or about February 1, 2011, Thompson began working
as an estate manager for Fox Estates in Maine with a salary
$5,000 higher than his last salary with the Trust.  The
Plaintiff does not dispute this fact, but notes that he was
subsequently demoted eight months later to a caretaker position
earning $80,000.

**The Summary Judgment Standard**

Summary judgment should be rendered if the pleadings,
the discovery and disclosure materials on file, and any

9

affidavits show that there is no genuine issue as to any
material fact and that the movant is entitled to judgment as a
matter of law.  Fed. R. Civ. P. 56(c).  The courts do not try
issues of fact on a motion for summary judgment, but, rather,
determine "whether the evidence presents a sufficient
disagreement to require submission to a jury or whether it is so
one-sided that one party must prevail as a matter of law."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52, 106 S.Ct.
2505, 91 L.Ed.2d 202 (1986).

        "The party seeking summary judgment bears the burden
of establishing that no genuine issue of material fact exists
and that the undisputed facts establish [its] right to judgment
as a matter of law."  Rodriguez v. City of N.Y., 72 F.3d 1051,
1060-61 (2d Cir. 1995).  Summary judgment is appropriate where
the moving party has shown that "little or no evidence may be
found in support of the nonmoving party's case.  When no
rational jury could find in favor of the nonmoving party because
the evidence to support its case is so slight, there is no
genuine issue of material fact and a grant of summary judgment
is proper."  Gallo v. Prudential Residential Servs., L.P., 22
F.3d 1219, 1223-24 (2d Cir. 1994) (citations omitted).  In
considering a summary judgment motion, the Court must "view the

evidence in the light most favorable to the non-moving party and draw all reasonable inference in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, "[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998).

When deciding a motion for summary judgment, a court must remain mindful of the fact that summary judgment is "an extreme remedy, cutting off the rights of the non-moving party to present a case to the jury." H & M Hennes & Mauritz LP v. Skanska USA Bldg., Inc., 617 F. Supp. 2d 152, 155 (E.D.N.Y. 2008).

**The Defendants Motion For Summary Judgment Is Granted In Part And Denied In Part**

11

The Plaintiff's Second Amended Complaint alleges seven causes of action: (1) defamation; (2) tortious interference with prospective business and contractual relations with respect to Thompson's relationships with the Calendar Group, Mahler Private Staffing and Vincent Minuto; (3) breach of the covenant of good faith and fair dealing with respect to Thompson's alleged agreements with the Trust; (4) breach of contract with respect to Lambert's confidentiality agreement; (5) breach of contract with respect to Thompson's alleged agreement with the Trust to remain employed to train his successor and receive severance in the form of three months' wages; (6) negligent misrepresentation; and (7) tortious interference with employment relations against Lambert, on the basis that Lambert intentionally procured the cessation of the employment relationship between Thompson and the Trust.  Based on the conclusions set forth below, the Defendants' motion for summary judgment is granted with respect to all counts, except the defamation count, where the Defendants' motion is granted in part and denied in part.

**A. The Defendants' Motion For Summary Judgment Is Granted In Part And Denied In Part With Respect To The First Cause Of Action For Defamation**

12

"New York law allows a plaintiff to recover for defamation by proving that the defendant published to a third party a defamatory statement of fact that was false, was made with the applicable level of fault, and either was defamatory per se or caused the plaintiff special harm, so long as the statement was not protected by privilege." See Chandok v. Klessig, 632 F.3d 803, 814 (2d Cir. 2011) (citing Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir. 2001)); Peters v. Baldwin Union Free Sch. Dist., 320 F.3d 164, 169 (2d Cir. 2003). "In deciding whether the jury should be allowed to pass upon statements alleged to be defamatory, the court need only determine that the contested statements 'are reasonably susceptible of defamatory connotation.' If any defamatory construction is possible, it is a question of fact for the jury whether the statements were understood as defamatory." Albert, 239 F.3d at 267 (quoting Purgess v. Charrock, 33 F.3d 134, 140 (2d Cir. 1994).

Under New York law, "only statements alleging facts can properly be the subject of a defamation action." 600 West 115th St. Corp. v. Von Gutfeld, 80 N.Y.2d 130, 139, 589 N.Y.S.2d 825, 603 N.E.2d 930 (1992). In addition, a plaintiff must allege the time, place and manner of the false statement and

13

identify to whom the false statement was made.  See Pure Power

Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC, No. 08 Civ.

4810(THK), 2011 WL 4035751, at *51 (S.D.N.Y. Sept. 12, 2011).

Special harm means economic or pecuniary loss.  See Liberman v.

Gelstein, 80 N.Y.2d 429, 434-35, 590 N.Y.S.2d 857, 605 N.E.2d

344 (1992).  Special harm "must flow directly from the injury to

reputation cause by the defamation[,] not from the effects of

defamation." Matherson v. Marchello, 100 A.D.2d 233, 235, 473

N.Y.S.2d 998 (2d Dep't 1984).  In order to constitute defamation

per se, the statement must (i) charge an individual with a

serious crime, (ii) injure another in his or her trade,

business, or profession, (iii) claim an individual has a

loathsome disease or (iv) impute unchastity to a woman.  Pure

Power Boot Camp, 2011 WL 4035751, at *51 (citing Liberman, 80

N.Y.2d at 435).


        To find that a statement qualifies as one that tends

to injure another in his or her trade, business or profession,

the statement "must be made with reference to a matter of

significance and importance for [the operation of the business],

rather than a more general reflection upon the plaintiff's

character or qualities." Pure Power Boot Camp, 2011 WL 4035751,

at *51 (quoting Liberman, 80 N.Y.2d at 436).  The statement must

14

be targeted at the specific standards of performance relevant to
the plaintiff's business and must impute conduct that is "of a
kind incompatible with the proper conduct of the business,
trade, profession or office itself." Pure Power Boot Camp, 2011
WL 4035751, at *51 (citing Aronson v. Wiersma, 65 N.Y.2d 592,
593, 493 N.Y.S.2d 1006, 483 N.E.2d 1138 (1985)).

     The Plaintiff has identified five statements that are
alleged to be defamatory.  First, on December 16, 2009, Lambert
allegedly made the following statement regarding Thompson to
Claudia Pache, an employee at a professional reference checking
company: "I would go for impromptu inspections.  Normally I take
what someone tells me as the truth; but in performing audits
things didn't come out accurately."  Second, on December 16,
2009, Lambert allegedly made the following response to a
question from Ms. Pache: "Q. Based on this information, would
you say that he was not always honest?  A.  Yes."  Third, on
October 28, 2009, Lambert stated to Vincent Minuto, the
principal at one of the employment agencies, that it had been
confirmed that Thompson had been taking kickbacks, failing to
report to work and working from home.  Fourth, on or about mid-
October 2009, Lambert stated to Scott Gerow, a colleague of the
Plaintiff, that he had found out that Thompson was "stealing . .

15

. that there were actual physical things that had been taken from the property . . . ."  Fifth, on or about October 13, 2009, Lambert stated to Lynn Warren, the provider of lawn services to the DeNiro estate: "Michael wasn't there.  He was trying to manage the place from [another state]" and "we think he's doing the same things as Joe [Jelske]," a reference to the criminal conduct of Thompson's predecessor.

### 1. Lambert's Statements To Claudia Pache

The Plaintiff has alleged that two statements Lambert allegedly made to Claudia Pache constitute defamation.  Ms. Pache is employed as a professional reference checker for a company called www.checkmyreference.com, a service that contacts former employers and obtains references.  "There are, generally speaking, four elements necessary to establish a prima facie case of slander: (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff.  The fourth element is presumed when the defamatory statement takes the form of slander per se."  Weldy v. Piedmont Airlines, Inc., 985 F.2d 57, 61 (2d Cir. 1993).  The Plaintiff asserts that Lambert defamed him when he told Pache that he would "go for impromptu

16

inspections" and that "in performing audits things didn't come
out accurately."  The Plaintiff, however, has failed to present
any evidence suggesting this comment to be false.  The second
statement the Plaintiff asserts to be defamatory is that Lambert
replied in the affirmative to Pache's question, "Based on this
information, would you say that he is not always honest?"
Rather than constitute a statement of fact, this remark
represents Lambert's opinion and is not actionable.  See Celle
v. Filipino Reporter Enters., Inc., 209 F.3d 163, 178 (2d Cir.
2000).  Accordingly, there is insufficient evidence of
defamation to support the Plaintiff's allegations concerning
Lambert's statements to Pache, and the Defendants' motion for
summary judgment is granted with respect to these statements.

### 2. Lambert's Statements To Vincent Minuto

Another instance of defamation alleged by the
Plaintiff involves an October 28, 2009 telephone conversation in
which Lambert allegedly told Vincent Minuto, the principal of
Hampton Domestics, that Thompson had been taking kickbacks, not
reporting to work, working from home and engaging in other
misconduct.  To support his allegations, the Plaintiff cites
testimony from Lambert's deposition and contends that the

17

evidentiary record establishes that the October 28, 2009 conversation took place and that during the conversation Lambert "discuss[ed] the reasons why Michael Thompson was terminated from employment." However, the reasons for Thompson's termination, according to Lambert's deposition testimony, involved "mold and mud that was found on the property" rather than the defamatory statements the Plaintiff has alleged. The Plaintiff questions the credibility of this testimony, contending that a December 1, 2009 email exchange between Thompson and Minuto proves that Lambert made defamatory remarks during the October 28 conversation. The email exchange the Plaintiff highlights involves one email from Thompson to Minuto in which Thompson states, in relevant part:

> First, I want to thank you for your phone call this afternoon. What I heard was very unsettling, but it did help give me some insight into the way things transpired concerning my departure from Riverside Trust. Thank you for being so open and candid with me. I can only hope that you will have the confidence and faith in me to recommend me to your clients and that, in time, the negative things you have heard will be proven unfounded.

Minuto responded to this email a few moments later, saying "I will do my best". Although this email exchange offers no evidence concerning the content of the October 28 conversation

18

between Minuto and Lambert, the Plaintiff highlights this
exchange as evidence of Lambert's defamatory statements.

The Defendants have presented evidence suggesting that
Lambert made no defamatory statements to Minuto during the
October 28 conversation.  In an email dated January 26, 2011,
Minuto wrote to Thompson, in relevant part, "I have no idea what
you are referring to in your last email regarding your last
position of employment."  Additionally, in an affidavit sworn on
February 25, Minuto stated, in relevant part:

> I also understand that the Complaint alleges that Lambert
> told me, on or about November 4, 2009 that "Thompson had
> been taking kickbacks from vendors and Thompson had
> routinely failed to report to work."  This allegation is
> not true. . . . To be clear, Lambert has never to my memory
> told me, in words or substance, that Thompson had been
> taking kickbacks, that he routinely (or ever) failed to
> report to work, or that Thompson had engaged in any kind of
> "venal and criminal activity."  Neither has anyone else
> affiliated with Riverside Trust made any such statements to
> me.
>
> I am also advised that the Complaint states that I called
> Thompson on or about December 1, 2009 to tell Thompson that
> Riverside Trust made these allegations to me, or that as a
> result, Hampton domestics could no longer represent
> Thompson in his job search.  I never told Thompson any such
> thing and, as above, Riverside Trust never made any such
> allegations to me.

19

The Plaintiff contends that this evidence and testimony is
unreliable because Minuto grossed at least $85,000 per year in
revenue placing domestic help with the DeNiros.  The Plaintiff
also contends that the January 26 email from Minuto to Thompson
is suspicious because of email traffic on January 25
establishing that Minuto forwarded to Lambert a January 12 email
he received from Thompson, and Lambert subsequently forwarded
this email to the Trust's attorney Tom Harvey.  Although the
evidentiary record does not include the text of the January 12
email from Thompson to Minuto, the Plaintiff contends that this
email reiterates the purported defamatory remarks Lambert made
to Minuto in the October 28 conversation.  The Plaintiff also
questions Minuto's credibility by highlighting various points in
his deposition testimony where he did not deny that the
defamatory remarks were said, but rather stated that he could
not recall.

        It is well-established that credibility issues, which
are questions of fact for resolution by a jury, are
inappropriately decided by a court on motion for summary
judgment.  Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir.
1996).  Additionally, there is a factual dispute as to the truth
of the comments Lambert allegedly made to Minuto, as the

20

Defendants assert that Thompson did receive kickbacks, while the
Plaintiff denies this allegation.  Because a genuine issue of
material fact has arisen, the Defendants' motion for summary
judgment with respect to the defamatory comments Lambert
allegedly made to Minuto is denied.

### 3. Lambert's Statements To Scott Gerow

     The Plaintiff alleges that on or about mid-October
2009, Lambert stated to Scott Gerow, a colleague at the Trust,
that he had found out that Thompson was "stealing . . . that
there were actual physical things that had been taken from the
property . . ."  The Defendants contend that this does not
constitute defamation because Thompson admittedly accepted free
landscaping services thereby making Gerow's statement true,
Thompson was not damaged by the statement and the statement is
privileged as the statement of a co-worker relating to the
common business of Gerow, Thompson and Lambert, all of who were
employed at the Trust.

     As noted above, there are material questions regarding
whether the Plaintiff did or did not pay for the lawn mowing
services that are the alleged "kickback."  While the Defendants

21

highlight deposition testimony in which Thompson stated that he received services for free, the Plaintiff contends that he never asked for any services for free, insisted on being billed for all services performed at his private residence and paid for every invoice he was given by Warren.  Notwithstanding the Defendants' contention that Thompson was not harmed by Gerow's statement, damages in this case are presumed since Gerow's statement "tend to injure another in his or her trade, business, or profession" and, as such, constitute defamation per se.

The Defendants also contend that the alleged statements from Thompson to Gerow are not defamation because they are protected by qualified privilege.  "Courts have long recognized that the public interest is served by shielding certain communications, though possibly defamatory, from litigation, rather than risk stifling them altogether." Liberman, 80 N.Y.2d at 437.  "One such conditional, or qualified, privilege extends to a communication made by one person to another upon a subject in which both have an interest. This 'common interest' privilege has been applied for example to employees of an organization."  Id. (citations omitted).  The rationale for applying the privilege is that the flow of information between persons sharing a common interest should not

22

be impeded.  Id.  Thompson and Gerow shared a common interest, in that both were employees of the Trust, and the deposition testimony reveals that the conversations between Thompson and Gerow centered around care of the DeNiro estate.

However, qualified privilege can be dissolved if a plaintiff can demonstrate that the defendant spoke with "malice."  See Park Knoll Assoc. v. Schmidt, 59 N.Y.2d 205, 211, 464 N.Y.S.2d 424, 451 N.E.2d 182 (1983).  In the aftermath of the Supreme Court's decision in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), New York courts have applied "malice" to have both its common law meaning as well as its constitutional meaning.  See Liberman, 80 N.Y.2d at 438 ("[M]alice now has assumed a dual meaning, and we have recognized that the constitutional as well as the common-law standard will suffice to defeat a conditional privilege").  Under the New York Times standard for malice, a plaintiff must establish that the "statements were made with a high degree of awareness of their probable falsity."  Id. (citing Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964)).  "Under common law, malice meant spite or ill will." Liberman, 80 N.Y.2d at 437 (citing Stillman v. Ford, 22 N.Y.2d 48, 53, 290 N.Y.S.2d 893, 238 N.E.2d 304 (1968); Shapiro v.

23

Health Ins. Plan, 7 N.Y.2d 56, 61, 194 N.Y.S.2d 509, 163 N.E.2d
333 (1959)).

Here, because the Plaintiff has failed to establish
Lambert's malice, ill-will or any degree of awareness that his
statements to Gerow were false, Lambert's statements to Gerow
are shielded by the qualified privilege of common interest and
cannot be considered defamatory.  Accordingly, the Defendants'
motion for summary judgment is granted with respect to Lambert's
remarks to Gerow.

### 4. Lambert's Statements To Lynn Warren

The Plaintiff alleges that on or about October 13,
2009, Lambert stated to Lynn Warren, the vendor who provided
lawn services to the Trust, that "Michael wasn't there.  He was
trying to manage the place from [another state]" and "we think
he's doing the same things as Joe [Jelske] . . ."  The reference
to Jelske refers to Thompson's predecessor at the Trust who
engaged in various acts of illegal conduct, including stealing,
demanding kickbacks and complicity in overbilling the DeNiros.
The Defendants contend that Lambert's remark to Warren is not
specific enough to constitute defamation.  The Defendants also

24

contend that the phrase "we think" classifies Lambert's
statement as an opinion rather than a statement of fact.

Under New York law, it is for the court to decide
whether the statements complained of are "reasonably susceptible
of a defamatory connotation, thus warranting submission of the
issue to the trier of fact." Silsdorf v. Levine, 59 N.Y.2d 8,
12-13, 462 N.Y.S.2d 822, 449 N.E.2d 716 (1983) (citations
omitted).  The statements alleged here imply that Thompson had
been engaged in criminal conduct and also could be interpreted
as injuring Thompson in his trade of estate management.  Because
Lambert's statements to Warren are reasonably susceptible of a
defamatory connotation, the Defendants motion for summary
judgment concerning these statements is denied.


### 5. Lambert's Statements To The Calendar Group And Mahler Private Staffing

In addition to the defamatory statements described
above, the Plaintiff's Second Amended Complaint suggests that
the Plaintiff was defamed by a Trust employee when the Calendar
Group and Mahler Private Staffing called the Trust for a
reference check.  Second Am. Compl. ¶¶ 37, 38.  The Plaintiff

has withdrawn any allegation that Lambert defamed Thompson to
the Pavillion Agency.

With respect to the Calendar Group, the Plaintiff has
provided no evidence of defamation.  The Defendants have
submitted an affidavit from the Calendar Group's owner
establishing that he sent Thompson's name to at least one
possible employer and would not have done so had Thompson
received a negative reference.  Although the Court granted the
Plaintiff's request to depose a Calendar Group employee named
Wolvovsky, the Plaintiff has not conducted this deposition and
has represented to the Court that "Wolvovsky will claim a
failure of memory regarding the content and result of [his]
conversation [with Lambert]."

The Plaintiff's opposition contends that Mahler
Private Staffing was given "such a bad reference that Plaintiff
was designated 'dnp,' the acronym for the blackballed permanent
status of 'do not process.'"  The Plaintiff bases these
allegations on a November 30, 2009 email sent internally within
Mahler Private Staffing in which a Mahler principal states:
"make a file and file away / he will be a dnp / he received a
bad reference from peter thomas, his former supervisor at the

26

DeNiro home".  The evidentiary record contains no other references to "Peter Thomas," and it is unclear whether the author of the email in referring to "Peter Thomas" truly meant to refer to "Peter Lambert."  The only evidence presented concerning the substance of the "bad reference" is an affidavit from Mahler's Support Services Manager, Shain Alexander.  In that affidavit, Mr. Alexander states, "I sought to determine whether there was any record at Mahler as to the nature of the 'bad reference' or if any Mahler employee remembered its substance.  I have concluded, as a result of this effort, that Mahler has no record of which I am aware specifying the nature of the 'bad reference' set forth on Ms. Lown's November 30, 2009 email, nor have I located any Mahler employee who has any recollection of the substance of the 'bad reference.'"  Without further evidence supporting the Plaintiff's allegations, any defamation claim concerning any Defendant's defamatory statements to the Calendar Group or Mahler Private Staffing is dismissed.

**B. The Defendants' Motion For Summary Judgment Is Granted With Respect To The Second Cause Of Action For Tortious Interference With Prospective Business And Contractual Relations**

27

The Plaintiff's second cause of action alleges that
Lambert's defamatory statements tortiously interfered with
Thompson's ability to find new employment through the Calendar
Group, Mahler Private Staffing and Minuto's employment agency,
Hampton Domestics.  The Plaintiff has withdrawn his allegation
of tortious interference insofar as the claims relate to the
Pavillion Agency.  Under New York law, the elements of a claim
for tortious interference with prospective business relations
are: (1) business relations with a third party; (2) the
defendant's interference with those business relations; (3) the
defendant acted with the sole purpose of harming the plaintiff
or used dishonest, unfair, or improper means; and (4) injury to
the business relationship.  See Nadel v. Play-By-Play Toys &
Novelties, Inc., 208 F.3d 368, 382 (2d Cir. 2000) (citing
Purgess v. Sharrock, 33 F.3d 134, 141 (2d Cir. 1994)).  Under
New York law, the second element requires the plaintiff to
demonstrate "direct interference with a third party, that is,
the defendant must direct some activities towards the third
party and convince the third party not to enter into a business
relationship with the plaintiff."  Randolph Equities, LLC v.
Carbon Capital, Inc., 648 F. Supp. 2d 507, 523 (S.D.N.Y. 2009)
(citations omitted).  A tortious interference with contractual
relations claim under New York law requires a plaintiff to

28

prove: (1) the existence of a valid contract between itself and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract; and (4) damages.  See <u>Mina Inv. Holdings Ltd. v. Lefkowitz</u>, 16 F. Supp. 2d 355, 359 (S.D.N.Y. 1998) (citations omitted).

The Plaintiff has provided no evidence of a tortious interference claim with respect to his relations with the Calendar Group.  Thompson did not take the deposition of any employee of the Calendar Group, and the affidavit of Calendar Group employee Steven Laitmon expressly states, "I have checked Calendar's files in regard to Thompson's employment application, and it contains no indication that Thompson was given a bad reference by Lambert or anyone else."  Because there is no evidence establishing either the direct interference of the Defendants with Thompson's relationship with the Calendar Group or the Defendants' intentional procurement of any breach of a contract between Thompson and the Calendar Group, the Plaintiff's second cause action is dismissed with respect to any allegations concerning the Calendar Group.

29

The Plaintiff's claim of tortious interference concerning Thompson's business relationship with Mahler Private Staffing is also dismissed.  As noted above, although the Plaintiff has presented an internal Mahler email dated November 30, 2009 stating that Thompson "received a bad reference from peter thomas, his former supervisor at the DeNiro home" and that Thompson "will be a dnp," there is no evidence describing the nature of this "bad reference" or any indication that it was defamatory.  The affidavit provided by Mahler employee Shain Alexander states: "In Mahler's usage, a 'bad reference' can include the fact that the applicant had been terminated by the former employer without reference to any specific act or conduct leading to the termination."

Although the Plaintiff contends that a previous version of Mr. Alexander's affidavit supports the conclusion that Thompson was given a negative reference by one of the Defendants, this previous affidavit states that "[s]everal factors can lead to a candidate receiving a 'DNP' status" including "[n]ot legally able to work in the United States; DUI conviction or significant driving violations (for jobs that require driving); [p]rior termination or bad reference from a previous employer; [m]isrepresentations on a resume,

30

application, or during an interview; or [l]ack of significant domestic experience or experience with high net worth employers."  The Plaintiff has presented nothing else to establish the substance of the "bad reference" from "peter thomas".  In opposing a motion for summary judgment, "the non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful." D'Amico, 132 F.3d at 149.  Because there has been no evidence presented that any Defendant acted with the sole purpose of harming the plaintiff or used dishonest, unfair, or improper means, or that any Defendant intentionally procured the breach of an agreement between Thompson and Mahler Private Staffing, the Plaintiff's claim of tortious interference with respect to Mahler Private Staffing is dismissed.

As noted above, there is a genuine issue of fact concerning whether Lambert made defamatory remarks concerning the Plaintiff to Minuto, the owner of Hampton Domestics. However, even if it is assumed that Lambert indeed made defamatory comments to Minuto, the Plaintiff's claim of tortious interference must be dismissed because the Plaintiff has failed to establish any harm.  In order to establish a claim of

31

tortious interference with business relations, the Plaintiff must demonstrate "direct interference with a third party, that is, the defendant must direct some activities towards the third party and convince the third party not to enter into a business relationship with the plaintiff." Randolph Equities, 648 F. Supp. 2d at 523. To prove a claim of tortious interference with contractual relations, the Plaintiff must establish, inter alia, that he suffered damages. See Lefkowitz, 16 F. Supp. 2d at 359. The evidentiary record establishes that Minuto, upon allegedly hearing Lambert's defamatory remarks on October 28 and receiving an email from the Plaintiff on December 1, responded "I will do my best." Minuto interpreted that response during his deposition testimony:

> Q. And what does "I will do my best" mean when you write—
>
> A. If a job comes up, I will definitely call you, you know, your name, your resume is in front of me on my desk, and you know, it's priority.
>
> Q. Fair to say if you respond, "I will do my best" that means I've read it, I acknowledge it, I'm going to do the best I can?
>
> A. I'm doing the best I can. Michael wanted to work in Maine, that's basically what I was trying to do, but that's not my area of expertise.
>
> Q. I'm not speaking about Mr. Thompson.
>
> A. Anyone that calls, like anyone that e-mails me, like I got two e-mails, I think, this morning, maybe it might have

32

been a driver or another estate manager or something, I
said, "I will do my best."  I can't say anything else, I
don't have a job right now, if something comes up, I'll do
the best that I can.


Given Minuto's deposition testimony, there is no evidence that

Lambert's allegedly defamatory remarks convinced Minuto not to

enter into a business relationship with Thompson or that

Thompson suffered any damages.  Accordingly, the Plaintiff's

claim of tortious interference with respect to his relationship

with Minuto is dismissed.


### C. The Defendants' Motion For Summary Judgment Is Granted With Respect To The Third Cause Of Action For Breach Of The Covenant Of Good Faith And Fair Dealing[1]


          The Plaintiff has asserted a claim for breach of the

covenant of good faith and fair dealing.  However, the

confidentiality agreement Thompson signed on May 11, 2009

included the following clause:

---

[1]     The Plaintiff's cause of action alleging breach of the
covenant of good faith and fair dealing is the third cause of
action in the Second Amended Complaint and the fourth cause of
action in the First Amended Complaint.  The Plaintiff has
withdrawn the First Amended Complaint's original third cause of
action.  For purposes of this opinion, the causes of action are
numbered in accordance with the Second Amended Complaint.

33

> The parties hereto acknowledge and agree that Employee's employment with Employer was an at-will employment relationship, terminable by either Employee or Employer, with or without cause, at any time, and that any such termination will not constitute a breach of any express or implied contract or covenant, will not be deemed to be tortious, wrongful, or give rise to any claim against or liability of Employer whatsoever.  In the event Employee terminates this agreement, Employee acknowledges and agrees Employee's covenants and agreements concerning the Confidential Information survive any such termination.

"As the courts within this district have repeatedly recognized, well-settled New York law holds that no implied covenant of good faith and fair dealing attaches to at-will employment contracts." Nunez v. A-T Fin. Info. Inc., 957 F. Supp. 438, 443 (S.D.N.Y. 1997); see also Boritz v. Fin. Info. Serv. Agency, No. 94 Civ. 5059 (JSM), 1995 WL 464955, at *4 (S.D.N.Y. Aug. 4, 1995); Tischmann v. ITT/Sheraton Corp., 882 F. Supp. 1358, 1367 (S.D.N.Y. 1995).  "The basis for this rule is that an obligation to abide by an implied covenant of good faith and fair dealing would be inconsistent with the employer's unfettered right to terminate an at-will employee." Nunez, 957 F. Supp. at 443 (citing Sabetay v. Sterling Drug, Inc., 69 N.Y.2d 329, 335-36, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987); Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 304-05, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983)).  Because Thompson is an at-will employee, he

34

cannot maintain a breach of the implied covenant of good faith
and fair dealing.

**D. The Defendants' Motion For Summary Judgment Is Granted With Respect To The Fourth Cause Of Action For Breach Of Contract**

The Plaintiff's fourth cause of action alleges that he
is a third-party beneficiary of a confidentiality agreement
between Lambert and the Trust and that the Defendants breached
the confidentiality agreement by giving the Plaintiff a
defamatory reference.  A party asserting rights as a third-party
beneficiary must demonstrate "(1) the existence of a valid and
binding contract between other parties, (2) that the contract
was specifically intended for his individual benefit and (3)
that the benefit to him is sufficiently immediate, rather than
incidental, to indicate the assumption by the contracting
parties of a duty to compensate him if the benefit is lost."
Mayo v. County of Albany, 357 Fed. Appx. 339, 343 (2d Cir. 2009)
(quoting State of Cal. Pub. Employees Ret. Sys. v. Shearman &
Sterling, 95 N.Y.2d 427, 434-35, 718 N.Y.S.2d 256, 741 N.E.2d
101 (2000)).  "It is ancient law in New York that to succeed on
a third party beneficiary theory, a non-party must be the
intended beneficiary of the contract, not an incidental

35

beneficiary to whom no duty is owed." <u>Madeira v. Affordable</u>
<u>Housing Foundation, Inc.</u>, 469 F.3d 219, 251 (2d Cir. 2006)
(collecting cases).

The Plaintiff alleges that Thompson was an intended
beneficiary of the confidentiality agreement between the Trust
and Lambert.  To support this contention, the Plaintiff cites an
email exchange between Thompson and Lambert in October 2009.  On
October 22, 2009, Thompson wrote to Lambert, in relevant part:

> What I wanted to ask you about is my need to take you up on
> your earlier offer of assistance to write a letter
> verifying my employment at Riverside Trust.  Would you be
> able to write one that documents the dates of employment,
> job title, and reason for leaving. As I recall, the
> official reason we discussed was that the estate manager
> position was restructured to a two person job, one person
> as major domo and another as caretaker.  This would be
> sufficient.  I am in the process of filling out application
> and, as you know, this letter is very important in the
> process of finding new employment.

On October 23, 2009, Lambert responded to Thompson's email:

> It is the policy for employment verification at Riverside
> Trust as well as throughout the industry, that being, I can
> verify the date of hire, date of termination at will.
> Confirmation of your starting and ending salary, as well as
> confirm that the Social Security number that you present to
> any perspective employers is the same as the one we have on
> file.  I am bound by the language contained within the

36

confidentiality agreement all employees sign to work at
Riverside Trust.

The Plaintiff contends that this email establishes that a
neutral reference was obligatory under the confidentiality
agreement.

Additionally, the Plaintiff relies upon various
portions of the confidentiality agreement.  The confidentiality
agreement reads, in relevant part:

Employee acknowledges and agrees that during the term of
her employment, Employee either has learned, obtained,
acquired or become aware of (and may in the future learn,
obtain, acquire or become aware of) information and items,
relating to or concerning Employer [the Trust] and Robert
DeNiro and Grace Hightower, their family, friends,
associates and other employees of Employer (collectively,
"Related Parties"); (b) private and confidential matters
concerning Employer or any Related Parties; (c) financial,
business, medical, legal, personal and contractual matters
of, or pertaining to, Employer or any Related Parties; (d)
letters, memoranda, contracts, e-mail transmissions and items,
other documents or writings (whether through customary
print media, electronic media or other media) pertaining in
any way to Employer or any Related Parties; and (e)
photographs of Employer or Related Parties, and any film,
video tape, audio tape or other means of replicating or
duplicating the images or likeness of any Related Party.
Employee further acknowledges and agrees that all of the
information and items described in the foregoing sentence
that Employee acquired during the term of her employment or
might acquire in the future as a result of her employment
is private and confidential and that it is exclusively
owned and controlled by Employer (herein such information

37

and items collectively referred to as "Confidential
Information").

The Plaintiff contends that this agreement protects Thompson
because Lambert agreed that "during the term of [] employment
[with the DeNiros] Employee has learned, obtained acquired or
become aware of [] information and items relating or concerning
[] employees of the Employer."  However, there is no language in
the confidentiality agreement naming Thompson as a beneficiary
to any of its terms.  The only parties mentioned in the
agreement are Lambert and the Trust.  Because there is no
evidence that the contractual benefit was specifically intended
for Thompson or that the benefit is sufficiently immediate,
rather than incidental, the Plaintiff's breach of contract claim
with respect to Lambert's confidentiality agreement is
dismissed.

### E. The Defendants' Motion For Summary Judgment Is Granted With Respect To The Fifth Cause Of Action For Breach Of Contract

The Second Amended Complaint's fifth cause of action
alleges that the Trust entered into an oral agreement with
Thompson whereby he would agree to stay to train his successor
and in exchange would receive payment during the transition

38

period and would receive a severance payment of at least three months' wages.  The Plaintiff alleges breach of this agreement because he was fired before he could train his successor and, as a result, was not paid during the transition period, nor did he receive the three months' severance pay.  The Plaintiff contends that, under New York law, if an employer is engaged in a practice of making severance payments to employees on the termination of employment and if an employee relies on this practice in accepting or continuing his or her employment, that employee has a cause of action against the defendant.  See Clark v. Buffalo Wire Works Co., 3 F. Supp. 2d 366, 373-74 (W.D.N.Y. 1998).

In support of the contention that a "standard transition package" existed for management employees, the Plaintiff cites Lambert's deposition testimony, which, according to the Plaintiff, confirmed that the DeNiros' attorney approved such an arrangement.  The Plaintiff also cites his own affidavit, which alleges that Lambert told the Plaintiff that he had consulted the DeNiros' attorney and arranged for a severance package for the Plaintiff.  However, a review of passages from the deposition transcript cited by the Plaintiff indicates that the topic of discussion was not Thompson's severance agreement

39

or a general policy of the Trust or the DeNiros, but rather the severance agreement entered into by the Plaintiff's predecessor. Regarding a severance package for Thompson, Lambert's deposition testimony included the following testimony:

> Q.  And did you estimate for Mr. Thompson at that time how long you thought that [the training period] would be, that would take?
>
> A.  Yes.
>
> Q.  What did you tell him?
>
> A.  90 days.
>
> Q.  What was Mr. Thompson's response to that, to that particular component to the discussion; in other words, staying on 90 days for the transition period?
>
> A.  He said whatever - - whatever was needed.
>
> Q.  During the course of the conversation with Mr. Thompson, did you make reference to any kind of a severance payment?
>
> A.  I said to him that I thought severance would be in order.
>
> Q.  Did you articulate to him what you thought the Riverside Trust practice was regarding the severance package?
>
> A.  Define "practice."
>
> Q.  Did you tell him that the expectation would be three months of severance pay?
>
> A.  I said to him that I was going to go back to Bob and Grace and discuss that fact, that, you know, it would take that long to train, and that 90 days, I felt at my

assessment, would be what - - the time period if a
transition was going to take place.

Notwithstanding the Plaintiff's contentions, Lambert's
deposition testimony does not establish a practice of granting
severance payments to terminated employees, nor does it prove
the existence of a severance agreement for Thompson.

On January 19, 2010, having received no severance
proposal, Thompson wrote directly to Mr. DeNiro to discuss
obtaining a severance package.   The letter, in pertinent part,
reads:

> On October 1, Peter met with me at Riverside and discussed
> the impending transition, including my severance package
> and anticipated scheduling.   Throughout our discussions
> Peter and I were focused on a transition period of three to
> four months and a respectable financial severance package.
> At the end of our meeting, Peter confirmed that he would
> need me to stay on until my successor was chosen by him and
> trained by me.   I was told that after the training was
> completed, I would likely receive three months' severance
> pay (that was the minimum Peter said Tom Harvey advised),
> and possibly continue on the company medical plan for an
> additional 90 days.   (This time frame would facilitate an
> orderly transition at Riverside Trust and also coincide
> with the end of my daughter's second year at New Paltz High
> School.)   While this was not a promise, Peter felt this was
> reasonable under the circumstances and he would work toward
> an arrangement along these lines.   Peter said he was going
> to have the transition and severance package details
> drafted for your review and that Tom Harvey would be in
> contact to let me know the final arrangements.

41

The Plaintiff's letter to Mr. DeNiro corroborates Lambert's testimony in that, while the possibility of severance was suggested, no formal agreement had been adopted.  The letter includes the phrase, "While this was not a promise, Peter felt this was reasonable under the circumstances and he would work toward an arrangement along these lines."  The letter goes on to establish that no arrangement concerning severance was reached.

Because there is insufficient evidence establishing either a severance agreement between Thompson and the Trust or a practice on the part of the Trust of making severance payments to terminated employees, the Defendants' motion for summary judgment is granted on this cause of action, and the Plaintiff's claim for breach of contract with respect to an agreement concerning Thompson's severance pay is dismissed.

**F. The Defendants' Motion For Summary Judgment Is Granted With Respect To The Sixth Cause Of Action For Negligent Misrepresentation**

The Second Amended Complaint's sixth cause of action alleges negligent misrepresentation, contending that the Defendants' false promises and assurances caused the Plaintiff

42

to stay in the employ of the Trust after being given notice that
he was being terminated, forestall his job search and allow
potential employers to call the Trust as a reference.  The
elements for a negligent misrepresentation claim are that "(1)
the defendant had a duty, as a result of a special relationship,
to give correct information; (2) the defendant made a false
representation that he or she should have known was incorrect;
(3) the information supplied in the representation was known by
the defendant to be desired by the plaintiff for a serious
purpose; (4) the plaintiff intended to rely and act upon it; and
(5) the plaintiff reasonably relied on it to his or her
detriment."  Hydro Investors, Inc. v. Trafalgar Power Inc., 227
F.3d 8, 20 (2d Cir. 2000).

        Here, the Plaintiff's claim for negligent
misrepresentation must be dismissed because there is no evidence
of a special relationship between the Plaintiff and the
Defendants.  An "employer/employee relationship does not import
a fiduciary duty under New York law." Gaugaix v. Laboratories
Esthederm USA, Inc., No. 98 Civ. 4465(LMM), 2000 WL 1528212, at
*8 (S.D.N.Y. Oct. 16, 2000) (citing Serow v. Xerox Corp., 166
A.D.2d 917, 917, 560 N.Y.S.2d 575 (4th Dep't 1990)); see also
Kwon v. Yun, 606 F. Supp. 2d 344, 356 (S.D.N.Y. 2009) ("As

                              43

courts have routinely held that the employer-employee
relationship does not constitute a special relationship
sufficient to support a claim for negligent misrepresentation,
plaintiff's negligent misrepresentation claim is not viable as a
matter of law.") (citing Stewart v. Jackson & Nash, 976 F.2d 86,
90 (2d Cir. 1992); Cannon v. Douglas Elliman, LLC, No. 06 Civ.
7092(NRB), 2007 WL 4358456, at *10-11 (S.D.N.Y. Dec. 10, 2007);
Onanuga v. Pfizer, Inc., No. 03 Civ. 5405(CM), 2003 WL 22670842,
at *3 (S.D.N.Y. Nov. 7, 2003); Metzler v. Harris Corp., No. 00
Civ. 5847(HB), 2001 WL 194911, at *2 (S.D.N.Y. Feb. 26, 2001)).
Accordingly, the Defendants' motion for summary judgment is
granted with respect to the sixth count of the Second Amended
Complaint.

### G. The Defendants' Motion For Summary Judgment Is Granted With Respect To The Seventh Cause Of Action For Tortious Interference

        The Second Amended Complaint's seventh cause of action
alleges that Lambert's misstatements to Mr. and Mrs. DeNiro
about his discovery of the Plaintiff's receipt of kickbacks
caused the DeNiros to terminate the Plaintiff in contravention
of the agreed-upon transition period.  "A plaintiff claiming
tortious interference under New York law must establish four

44

elements: 1) a valid contract, 2) knowledge by a third party of
the contract, 3) conduct by the third party to intentionally and
improperly procure the breach of the contract, and 4) damage to
the plaintiff as a result of the breach." Jean-Louis v.
American Airlines, No. 08-CV-3898 (FB), 2010 WL 3023943, at *2
(E.D.N.Y. Jul. 30, 2010) (citing Albert, 239 F.3d at 274).
"[A]n at-will employee may establish a claim for tortious
interference but only if the defendant engaged in fraud or
misrepresentation, made threats, or acted with malice." Jean-
Louis, 2010 WL 3023943, at *2.


     "[O]nly a stranger to a contract, such as a third
party, can be held liable for tortious interference with the
contract." Minetos v. City Univ. of N.Y., 925 F. Supp. 177, 187
(S.D.N.Y. 1996); see also Finley v. Giacobbe, 79 F.3d 1285, 1295
(2d Cir. 1996). "This principle holds in the employment context
as well." Finley, 79 F.3d at 1295 (citing Mansour v. Abrams,
120 A.D.2d 933, 934, 502 N.Y.S.2d 877 (4th Dep't 1986)). "In
order to show that a defendant-employee is a 'third party,' a
plaintiff must show that the defendant-employee has exceeded the
bounds of his or her authority." Finley, 79 F.3d at 1295
(citing Kosson v. Algaze, 203 A.D.2d 112, 113, 610 N.Y.S.2d 227
(1st Dep't 1994); see also Minetos, 925 F. Supp. at 187 ("[A]n

45

agent cannot be held liable for inducing a principal to breach a contract with a third person, at least where he [or she] is acting on behalf of his principal and within the scope of his authority.") (quoting Nu-Life Constr. Corp. v. Bd. of Educ., 204 A.D.2d 106, 107, 611 N.Y.S.2d 529 (1st Dep't 1994).

At the time of the alleged tort, both Lambert and Thompson were employees of the Trust. The evidentiary record establishes that Lambert served as Thompson's supervisor at the DeNiro estate. See G. DeNiro Dep. at 8-9 ("Q. Did [Lambert] have a supervisory relationship regarding Michael Thompson? A. Yes."). Although the Plaintiff alleges that Lambert misinformed Ms. DeNiro about Thompson's alleged improprieties, there is no evidence to suggest that, in doing so, Lambert was acting outside his scope of employment with the Trust. See Finley, 79 F.3d at 1295 (affirming grant of summary judgment dismissing tortious interference with contract claim where at-will employee failed to demonstrate supervisor acted outside the scope of employment in effectuating plaintiff's termination). Accordingly, the Defendants' motion for summary judgment is granted with respect to the seventh cause of action.

**Conclusion**

46

Based on the conclusions set forth above, the Defendants' motion for summary judgment is granted with respect to all counts, except the defamation count, where the Defendants' motion is granted in part and denied in part.

It is so ordered.

**New York, NY**
**February 23 , 2012**

_____
        **ROBERT W. SWEET**
           **U.S.D.J.**

47